UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
RUBY ELIZABETH LADERSON,

        Plaintiff,

                 10 CV 7797 (RPP)

 -against-

                **OPINION & ORDER**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.
-------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

   Plaintiff Ruby Elizabeth Laderson, pro se, brings this action pursuant to § 205(g) and § 1631(c)(3) of the Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying her Supplemental Security Income ("SSI") and disability insurance benefits. (Compl. ¶ 1.)  The Commissioner moves pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") for a judgment on the pleadings affirming the Commissioner's decision that the Plaintiff was not disabled. (Def.'s Mem. at 1.)  For the reasons that follow, the Commissioner's motion is granted.

**I. Background**

  **A. Procedural History**

   On February 14, 2008, Plaintiff filed applications for SSI and disability insurance benefits under Title II and Title XVI of the Social Security Act. (Transcript of the Administrative Record filed by the Commissioner  ("Tr.") at 11.)[1]  Plaintiff sought benefits retroactive to

---

[1] References to "Tr." are to the transcript of the administrative record filed by the Commissioner on January 28, 2011 as part of his Answer.

1

January 11, 2008, the date of the alleged onset of her disability. (Id.)  Plaintiff alleged disability due to congestive heart failure, diabetes, asthma, and osteoarthritis. (Compl. ¶ 3.)

On October 20, 2009, Plaintiff appeared before Administrative Law Judge Robert Gonzalez (the "ALJ") in White Plains, New York for a hearing. (Tr. at 18.)  On December 23, 2009, ALJ Gonzalez issued a letter decision denying Plaintiff's claim. (Defendant's Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings ("Def.'s Mem.") at 2.)

On August 17, 2010, the Appeals Counsel denied Plaintiff's request for a review of the ALJ's decision, making it the "final decision" of the Commissioner. (Def.'s Mem. at 2.)  On October 7, 2010, Plaintiff, proceeding pro se, filed a Complaint with this Court seeking review of the ALJ's decision denying her claim for disability benefits.

On February 2, 2011, Plaintiff submitted a letter requesting that her case be transferred in Memphis, Tennessee. (Endorsed Letter 1, Feb. 2, 2011, ECF No. 12.)  On February 7, 2011, the Court, noting that that Plaintiff's appearance would not be necessary for a determination of the action, denied Plaintiff's request to transfer the action to Tennessee. (Id. at 2.)

On February 28, 2011, the Commissioner filed a motion for a judgment on the pleadings. (Def.'s Mem. at 1.)  On October 5, 2011, Plaintiff opposed that motion and cross-moved for a judgment on the pleadings. (Notice of Motion, Oct. 7, 2011, ECF No. 21.)  On November 18, 2011, the Commissioner submitted a Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings.[2]

---

[2] The court received a letter dated October 14, 2011 from Binder and Binder. The letter indicated that Binder and Binder's last communication with the Plaintiff was on September 7, 2010. Binder and Binder indicated that the firm was not responsible for Plaintiff's October 5, 2011 memorandum of law, even though it appeared to be endorsed by Eddy Pierre, an attorney at the firm. Mr. Pierre had previously represented Plaintiff. The Court approved Binder and Binder's request to be removed as counsel of record to the extent that the court has recognized it as such. Plaintiff subsequently submitted a letter dated November 28, 2011 in which she clarified that her brief submitted with Binder and Binder's name was rewritten from a previous brief and that she simply intended to give the firm credit for the research.

### B.     Non-Medical Evidence

Plaintiff Ruby E. Laderson was born March 15, 1951, and she was 56 at the alleged onset of her disability. (Def.'s Mem. at 2.)  Plaintiff has a college degree and also reports to have taken some graduate courses. (Id.)  At the October 20, 2009 hearing before the ALJ, Plaintiff indicated her work history as follows: Plaintiff worked as a bus driver from 2005 to January 11, 2008, the date of the alleged onset of her disability. (Tr. at 28–29.)  From 1999 to 2003, Plaintiff worked as a foster care case manager. (Tr. at 29.)  From 1995 to 1999, Plaintiff studied for her bachelor's degree. (Id. at 30.)  From 1969 to 1992, Plaintiff worked in clerical and administrative services.[3] (Tr. at 30.)

Plaintiff also reported that she lived in a women's shelter in Brooklyn. (Tr. at 26.) Plaintiff stated that for the eighteen months prior to the hearing, she sought work at a job center two hours from the shelter. (Tr. at 61.)  Plaintiff described herself as "extremely computer literate," indicating that she used a computer to search and apply for jobs. (Tr. at 46.)  She reported using public buses and the subway. (Tr. at 61–62.)  Plaintiff was able to care for personal needs and make small purchases at the store. (Tr. at 45–46.)

### C.     Medical Evidence

#### 1.     *Mount Vernon Hospital Outpatient Clinic*

On January and February of 2008, Plaintiff was seen several times at Mount Vernon Hospital's outpatient clinic. (Tr. at 197–229.)  Tests from January 11, 2008 indicate that Plaintiff received an electrocardiogram, chest x-rays, and a series of blood tests. (Tr. at 203–07, 210–11.) The abnormal electrocardiogram revealed normal sinus rhythm, left atrial enlargement, poor R wave progression V1-V4, and nonspecific T wave abnormality. (Tr. at 210.)  The blood tests

---

[3] The Court notes that the Plaintiff indicated contradictory dates in a Work History Report filed with the Social Security Administration. In the report, she listed that she worked as a bus driver from 2006 to 2008, a social services case manager from 1997 to 2003, and in administrative support services from 1990 to 1997. (See Tr. at 176.)

revealed abnormalities in Troponin I, B-type natriuretic peptide (BNP) (cardiac marker), metabolic components. (Tr. at 203–07; repeated at Tr. at 224–28.) Plaintiff's chest x-ray showed the heart to be mildly enlarged but with no evidence of consolidation or pulmonary vascular congestion. (Tr. at 211, repeated Tr. at 229.) The doctor's impression was no active pulmonary disease. (Id.)

On January 15, 2008, Plaintiff was seen again at Mount Vernon Hospital with complaints of gradually increasing shortness of breath for the previous five days. (Tr. at 198–201, 218.) The assessment was CHF exacerbation secondary to cardiopathy, rule out previous myocardial infarction, uncontrolled hypertension, type I diabetes mellitus, and dyslipidemia. (Tr. at 201.) Electrocardiogram and echocardiogram tests were prescribed, followed by a cardiology consultation. (Id.) The cardiology consultation report noted that Plaintiff complained of shortness of breath on walking over a block and a half, but there were no complaints of chest pain, palpitations, or diaphoresis (excessive perspiration). (Tr. at 202.) The report noted that Plaintiff's medications were Fosinopril, Lasix, and Vytorin.[4] (Id.) The physician advised Plaintiff to take a nuclear stress test. (Id.) Plaintiff refused to add Norvasc to control her blood pressure. (Id.)

On January 23, 2008, Plaintiff's electrocardiogram revealed normal sinus rhythm, poor R wave progression in precordial leads, and nonspecific T wave abnormality. (Tr. at 213.) The echocardiogram report indicated mild mitral regurgitation, borderline left ventricular hypertrophy, a hypokinetic septum, and a left ventricular ejection fraction of 44 percent. (Tr. at

---

[4] Fosinopril generally treats high blood pressure. MedlinePlus Drug Information, *Fosinopril*, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692020.html (last updated Jul. 1, 2010). Lasix (furosemide) is a water pill used to help reduce swelling and help the body rid itself of excess fluid. MedlinePlus Drug Information, *Furosemide*, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682858.html (last updated Sept. 1, 2008). Vytorin is medication combination of simvastatin and ezetimibe used to decrease liver production of cholesterol. MedlinePlus Drug Info, *Ezetimibe*, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603015.html (last updated Aug. 1, 2010).

208.) A February 6, 2008 progress record indicates that Plaintiff was seen by a doctor, but left without discharge instructions and her prescription. (Tr. at 222.) On March 27, 2008, Plaintiff returned for a regular follow up and for medication refills, though she had no active complaints. (Tr. at 218.)

### 2. *Dr. Rose Chan, North Disability Services*

On April 29, 2008, Rose Chan, M.D., at North Disability Services in Hartsdale, New York, performed an internal medicine exam after a referral by the Division of Disability Determination. (Tr. at 230.) Plaintiff appeared to be in no acute distress. (Id.) Without assistance, Plaintiff changed for the exam, got on and off the exam table, and rose from the chair with no difficulty. (Id.) Plaintiff reported that she cooked, cleaned, washed laundry, and shopped. (Id.) She also reported to shower and dress herself, watch television, and read. (Id.)

Upon physical examination, the Plaintiff was five feet, four inches tall and weighed 244 pounds. (Id.) Her blood pressure was 130/80. (Id.) Her pulse was 80 beats per minute and her respirations were 14 per minute. (Id.) Dr. Chan's examination of Plaintiff's chest and lungs indicated a normal anterior-posterior diameter, clear to auscultation, with normal percussion. (Tr. at 232.) She had no significant chest wall abnormality and normal diaphragmatic motion. (Id.) Plaintiff's heart had a regular rhythm, with the point of maximal impulse in the left fifth intercostal space at midclavicular line. (Id.) The heart had no murmur, gallop, or rub audible. (Id.)

An evaluation of her extremities revealed mild clubbing of the fingers and moderate pitting edema of both shins. (Tr. at 233.) Dr. Chan diagnosed a history of myocardial infarction times two, history of congestive heart failure, hypertension, insulin dependent diabetes mellitus, and history of asthma. (Id.) Dr. Chan indicated Plaintiff's prognosis as fair. (Id.) Dr. Chan

recommended moderation limitation for exertional activities due to her clinical history of myocardial infarction and noted for the Plaintiff to avoid respiratory irritants. (Id.)

### 3.     Dr. A. Auerbach, State Medical Consultant

On May 7, 2008, Dr. Auerbach, a state medical consultant, reviewed Plaintiff's medical evidence. (Tr. at 234.) In reviewing Plaintiff's records, Dr. Auerbach indicated that the January 2008 heart attack was "neither ruled in or out" and that "claimant signed herself out against medical advice." (Id.) He noted that the records did not indicate chest pain, jugular vein distention, or gallop, all indicators of a heart attack. (Id.) Further, he noted that Plaintiff's "allegations of shortness of breath" are likely impacted by her "morbid obesity and likely deconditioning." (Id.) Considering the totality of the medical evidence, Dr. Auerbach concluded that Plaintiff should be capable of lifting twenty pounds occasionally and ten pounds frequently, standing and walking six to eight hours per day, and sitting six to eight hours per day. (Id.)

### 4.     Westchester Medical Center Outpatient Treatment

From April 2008 to September 2008, Plaintiff received treatment at Westchester Medical Center for diabetes mellitus, coronary artery disease, congestive heart failure, hypertension, hypercholesterolemia, and pain in the lower back, hips, and knees. (Tr. at 261–89.) On April 14, 2008, Plaintiff complained of flu-like symptoms, including chest tightness, fever, shortness of breath, stuff nose, and congestion. (Tr. at 276.) Plaintiff was diagnosed with an upper respiratory infection and was prescribed antibiotics. (Tr. at 277.) An April 14, 2008 blood test indicated normal BNP and abnormalities in platelet count, platelet volume, glucose, and hemoglobin A1c. (Tr. at 283, 286, 289.) An April 24, 2008 urine test indicated normal levels of kidney function indicators albumin and creatinine. (Tr. at 284–85.) On April 24 or 25, 2008, Plaintiff reported that her flu symptoms had improved completely. (Tr. at 274–75.) The medical notes indicated

high blood glucose and hemoglobin A1c levels and poor blood sugar control. (Tr. at 274.) Plaintiff's diabetes medication was also increased. (Tr. at 275.)

On June 4, 2008, Plaintiff returned for a prescription renewal with complaints of bone pain and muscle weakness, especially in the lower back, hips, and knees. (Tr. at 272–73.) The assessment was possible osteoarthritis secondary to obesity. (Tr. at 273.) Plaintiff's diabetes appeared fairly well controlled. (Id.) A June 12, 2008 x-ray of Plaintiff's right hip demonstrated a "spur like ossification extending from the region of the lesser trochanter to the femoral neck medially," possibly related to old trauma. (Tr. at 282.) There was some spurring at the iliac crest and mild narrowing of the superolateral hip joint. (Id.) An x-ray of Plaintiff's left hip on the same day demonstrated similar ossification findings, which may be related to a calcified iliopsoas tendon. (Tr. at 280.) No acute fracture or dislocation was seen. (Id.) An x-ray of Plaintiff's knees demonstrated mild to moderate narrowing of the medical compartment left greater than right. (Tr. at 281.) Spurring in the tricompartmental distribution was seen as was a spur in the lateral intercondylar region on the right versus a small intra-articular body 3 mm in size. (Tr. at 281; see Tr. at 288.)

On June 24, 2008, Plaintiff visited the Center to complete paperwork for a transitional housing program. (Tr. at 268.) She indicated that her muscle strength had improved since her previous visit but that she still had back pain. (Id.) A rheumatoid factor test was negative. (Tr. at 279.) On July 22, 2008, Plaintiff returned for a follow up appointment. (Tr. at 266.) She claimed to have recently recovered from a viral infection and reported feeling "fine." (Id.) She reported no problems with dyspnea (shortness of breath) as long as she took her medication. (Id.) Plaintiff stated that she walked daily, without difficulty, as a form of exercise. (Id.) Plaintiff reported checking her blood sugar every morning and stated that it was under control. (Id.) A July 22, 2008 blood test indicated low cholesterol. (Tr. at 278.)

7

On September 26, 2008, Plaintiff complained of back and knee pain, for which she took Aleve (naproxen sodium). (Tr. at 264–65.)  Plaintiff's hypertension and diabetes mellitus were noted to be well-controlled. (Tr. at 265.)  A November 26, 2008 note indicated that the Plaintiff was a "no show/no reschedule" for a consultation with an endocrinologist. (Tr. at 287.)  Additional notes indicated that Plaintiff was a "no show" for nutrition consultations on June 12, 2008 and December 18, 2008. (Tr. at 263, 271.)

### 5. *Christ Community Health Services*

On March 5, 2009, Plaintiff was seen at Christ Community Health Services in Memphis, Tennessee, to establish a primary care physician and obtain insulin refills. (Tr. at 254.)  The visit notes indicated that she could not pay for her refills. (Id.)  On August 6, 2009, Plaintiff returned for medication refills and to "establish disability." (Tr. at 253.)  A blood test indicated abnormalities in mean cell hemoglobin, red blood cell distribution width, hemoglobin A1c, glucose, lipid, and metabolic components. (Tr. at 255–56.)

An August 13, 2009 computed tomography ("CT") scan of the brain was normal. (Tr. at 257.)  A CT scan of Plaintiff's cervical spine on the same date revealed advanced degenerative changes of the cervical spine without evidence of acute or chronic cervical spine fracture. (Tr. at 258.)

### 6. *Evidence Submitted After the Adjudicated Period*

Plaintiff submitted additional evidence to the Appeals Council dated March 2010 to July 2010. (Tr. at 290–393.)  In an August 17, 2010 letter denying Plaintiff's request for review, the Appeals Officer advised her that since the evidence related to a period after the adjudicated period ending December 23, 2009, it did not affect the decision regarding Plaintiff's disability status on or before December 23, 2009. (Tr. at 1–3.)

The submitted evidence included records of Plaintiff's hospitalization at Harlem Hospital Center from March 25 to 30, 2010 (Tr. at 317–18, 330–54), with a discharge record of acute asthma exacerbation. (Tr. at 337–39.)  An April 1, 2010 cardiac visit note indicates Plaintiff's diagnosis and treatment plan of care related to congestive heart failure. (Tr. at 328–29).  April 2010 records include lab work and a biosocial summary from FEGS, a nonprofit health and human services organization. (Tr. at 290–313, 355–65; repeated in part at Tr. 366–89.)  On April 22, 2010, Plaintiff returned to Harlem Hospital Center for a routine follow up. (Tr. at 326–28.)  On April 26, 2010, Plaintiff returned to Harlem Hospital Center with no complaints to establish primary care. (Tr. at 321–25.)  On May 5, 2010, she was seen again at Harlem Hospital Center, with complaints of low back pain. (Tr. at 319–20.)  A May 10, 2010 echocardiogram report indicated severe global hypokinesis on the left ventricle, mild to moderate mitral regurgitation, and evidence of severe pulmonary hypertension. (Tr. at 314–16.)  Plaintiff also submitted a handwritten note from Dr. Lara Oboler, a cardiologist at Lenox Hill Hospital, stating that Plaintiff had stage IV congestive heart failure, a nonischemic cardiomyopathy, status post automatic implantable cardioverter-defibrillator, and severe asthma. (Tr. at 391.)  The note concluded that Plaintiff was not able to work and had a "poor prognosis." (Id.)

## II.    Standard of Review

In a motion for judgment on the pleadings, the basis for the court's decision is limited to considering the factual allegations set forth in the complaint and corresponding answer. Fed. R. Civ. P. 12(c).  If the moving party shows that there is no genuine dispute as to any material fact, then it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.  A district court's review of a Commissioner's final decision denying disability benefits is limited to whether the decision is based upon legal error or is unsupported by substantial evidence. Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  The Commissioner's decision should be given substantial deference.

Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).  The reviewing court "may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon a *de novo* review." Id. (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)).  In other words, the court is not to review the judgment *de novo*. Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998).

The Supreme Court defines substantial evidence as "more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The Commissioner's findings of fact, if supported by substantial evidence, are conclusive; they need not have been resolved under the preponderance of evidence standard. 42 U.S.C. § 405(g); Rutherford v. Schweiker, 685 F.2d 60, 61 (2d Cir. 1982).

### III.  Discussion

#### A.  The Disability Determination

To be eligible for disability benefits under the Social Security Act, a claimant must establish his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Further, the claimant's physical or mental impairment must be

> of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C.A. § 423(d)(2)(A).

The Social Security Administration has promulgated a five-step procedure for evaluating disability claims:

> First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464 (2d Cir. 1982); see 20 C.F.R. 404.1520(a); 20 C.F.R. 416.920(a). The facts that must be considered in determining a claimant's benefit entitlement are "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983).

In concluding that Plaintiff was not under a disability within the meaning of the Social Security Act from January 11, 2008 through December 23, 2009, the ALJ adhered to the five-step sequential analysis. (Tr. at 11–17.) At the first step, the ALJ determined that the Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date of January 11, 2008. (Tr. at 13.) At the second step, the ALJ determined that the Plaintiff had four severe impairments that caused more than minimal limitations in basic work-related functions: coronary artery disease, hypertension, asthma, and morbid obesity. (Id.) The ALJ found that Plaintiff's alleged impairments, including a history of type I diabetes mellitus and alleged osteoarthritis, were nonsevere. (Tr. at 13–14.) While Plaintiff alleged to have rheumatoid arthritis and

indicated symptoms such as hip spurring, muscle aches, and joint pains, the ALJ determined that without objective clinical or diagnostic findings, symptoms alone could not be considered to cause functional restrictions. (Id. 13–14.)  At the third step, the ALJ determined that the Plaintiff did not have an impairment or combination of impairments that "meets or medically equals one of the listed impairments in [the Social Security Act]." (Tr. at 14.)  Regarding Plaintiff's history of heart disease and congestive heart failure, the ALJ noted that there was "no evidence of chest pain, arrhythmias resulting in palpitations, lightheadedness, or fainting," and that there was "no conclusive evidence that the claimant had a heart attack." (Id. 14.)  Regarding Plaintiff's complaints of shortness of breath and peripheral edema (swelling of the limbs), the ALJ indicated that any of the symptoms could be attributed to Plaintiff's excess weight. (Id.)  In concluding the third step, the ALJ noted that the Plaintiff did not have visual, renal, or neurological problems related to her diabetes. (Id.)

Before considering step four, the ALJ assessed Plaintiff's Residual Functional Capacity ("RFC"), the capacity to engage in work related activities. After considering the entire record, the ALJ found that the claimant had an RFC to perform the full range of sedentary work.[5] (Tr. at 16.)  The Social Security Act defines sedentary work as work that

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 CFR §§ 404.1567(a) and 416.967(a).  The ALJ also recommended that the Plaintiff avoid respiratory irritants. (Tr. at 16.)  The ALJ used a two-step process to consider the Plaintiff's symptoms. (Tr. at 14.) First, he determined whether there were medically determinable physical

---

[5] Sedentary work is the least rigorous of the five categories of work under SSA regulations. The categories include "very heavy," "heavy," "medium," "light," and "sedentary." 20 C.F.R. § 404.1567.

or mental impairments. (Tr. at 14.)  If so, then the ALJ evaluated the "intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities." (Tr. at 14.)  The ALJ found that although Plaintiff's impairments indicated in the medical evidence could reasonably be expected to cause the symptoms alleged, the Plaintiff's "statements concerning the intensity, persistence and limiting effects" of the symptoms were "not credible to the extent they are inconsistent with the . . . residual functional capacity assessment." (Tr. at 15.)  In the absence of a treating physician opinion showing a more restrictive RFC, the ALJ gave "some weight" to the May 2008 opinion of Dr. Alan Auerbach, the state agency medical consultant. (Tr. at 16.)  Dr. Auerbach's opinion stated that claimant had the RFC for light exertion work.[6] (Tr. at 14.)  Dr. Auerbach described light exertion work as lifting 20 pounds occasionally and 10 pounds frequently, standing or walking for six to eight hours, and sitting for six to eight hours. (Tr. at 16, 234.)  The ALJ also relied on the "scant cardiac findings" and Plaintiff's "conservative treatment received since the claimant's hospitalization in February 2008." (Tr. at 16.)

In the fourth step of the evaluation, the ALJ determined that the Plaintiff was capable of performing her past relevant work as a secretary since it does not require performance of work-related activities outside of her RFC. (Id.)  Since the Plaintiff did not meet her burden of proving a disability under the Social Security Act, the ALJ concluded that the Plaintiff was not under a disability under the Social Security Act from the period dating January 11, 2008 to December 23, 2009. (Tr. at 17.)

---

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567.

### B.   Evidence Submitted Did Not Relate to the Relevant Period and Did Not Constitute a Basis to Change the ALJ's Decision

Plaintiff argues that the ALJ's decision should be vacated based on additional evidence submitted after the ALJ's December 23, 2009 decision. (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss, ECF No. 21 ("Pl.'s Br.") at 4.)[7] Under 42 U.S.C. § 405(g), a court may order the Commissioner to consider additional evidence, "but only upon a showing that there is new evidence which is material and that there is good cause for the [claimant's] failure to incorporate such evidence into the record in a prior proceeding." The Government argues that the materials that Plaintiff submitted does not provide a basis for changing the ALJ's decision since 1) the records do not relate to the disability period of January 11, 2008 to December 23, 2009, and 2) the records do not contradict the ALJ's finding. (Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Further Support of the Commissioner's Motion for Judgment on the Pleadings ("Def.'s Reply Br.") at 3.)

New and material evidence will provide a basis for the Appeals Council to change the ALJ's decision "only where it relates to the period on or before the date of the [ALJ] hearing decision." 20 C.F.R. §§ 404.970(b), 416.1470(b).  Since the additional evidence was dated March 2010 to July 2010, and Plaintiff was found to be under a disability beginning December 24, 2009, the additional evidence does not warrant a change in the ALJ's decision for a prior period. (Tr. at 2.)

### C.   Substantial Evidence Supports the ALJ's Finding that Plaintiff's Subjective Complaints Were Not Credible to the Extent Alleged

---

[7] The Court's references to Plaintiff's brief filed October 7, 2011 are to page numbers in the ECF legend on the top of each page of the brief.

Plaintiff argues that the ALJ failed to properly assess her allegations of pain and improperly considered her impairments. (Pl.'s Br. at 9.) Under Social Security Administration regulations, an individual's statement of pain cannot serve as conclusive evidence of disability unless it is accompanied by objective medical evidence.[8] 20 C.F.R. § 404.1529. For statements regarding pain or other symptoms that lack objective medical evidence, the ALJ is charged with assessing the credibility of statements about the "intensity, persistence, or functionally limiting effects of pain," after considering the entire case record. (Tr. at 14.) The ALJ considered the clinical findings with regards to Plaintiff's complaints of shortness of breath, neck and leg pain, and asthma. (Tr. at 14–16.) In assessing the credibility of the statements, the ALJ properly considered Plaintiff's testimony at the hearing that she was not on pain medication other than over-the-counter analgesics; that she was seeking work and was able to sit for long periods at a computer; that she takes public transportation; and that she does a lot of walking during the day. (Tr. at 15.)

Plaintiff argues in her memorandum that she was prescribed "veterinary doses" of medication that have side effects of severe muscle weakness and pain. (Pl.'s Br. at 7.) The government accurately points out that, according to The Merck Manual, the dosages prescribed of Furosimide (used to reduce swelling and fluid retention) and Lisonopril (used to treat high blood pressure) were within ordinary limits. See Merck Manuals Online Medical Library, available at http://www.merckmanuals.com/professional/lexicomp/furosemide.html (visited 12/2/11); http://www.merckmanuals.com/media/professional/pdf/Table_071-8.pdf (visited 12/2/11). Thus, the Court finds Plaintiff's argument on this point to be without merit.

---

[8] "Your symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. § 404.1529.

The ALJ properly assessed the credibility of Plaintiff's statements. Nothing in the record indicates that the ALJ did not fully consider the medical evidence and the Plaintiff's statements regarding her pain. Substantial evidence, including clinical findings and Plaintiff's own testimony, supports the ALJ's conclusion that the Plaintiff could perform sedentary work.

### D. The ALJ Properly Developed the Record

The ALJ has an affirmative duty to develop the record, whether the claimant is pro se or otherwise represented. Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996). Plaintiff argues that the ALJ failed to properly develop the record, warranting remand of the case for further development of the record. (Pl.'s Br. at 7.)  When the record contains sufficient medical evidence concerning Plaintiff's impairment, then the ALJ is not required to seek additional evidence. See 20 C.F.R. § 404.1512.  The Plaintiff argues that the ALJ should have ordered a blood test at her request. (Pl.'s Br. at 10.)  The Government correctly points out that the results of repeated blood tests are found in the record. (Gov.'s Br. at 4.; see Tr. at 203–07, 224–28, 255–56, 273, 278–79, 283, 286, 289.)  Since the record contained evidence sufficient to make a disability determination, the ALJ was under no obligation to seek an additional blood test. Therefore, the ALJ properly satisfied his duty to develop the record.

### E. The ALJ Properly Assessed Plaintiff's Residual Functional Capacity

Plaintiff argues that the ALJ failed to assess an accurate residual functional capacity by not accounting for her need to avoid respiratory irritants and minimizing her claim of disabling cardiac disease. (Pl.'s Br. at 9, 11.)  The ALJ properly concluded that Plaintiff should avoid respiratory irritants, noting that "Dr. Chan opined that the claimant should avoid respiratory irritants." (Tr. at 15). The ALJ further concluded that Dr. Chan's opinion was "given great weight," and again noted this restriction when considering whether the Plaintiff could do her past work as a secretary. (Tr. at 16–17.)

16

In considering opinion evidence, the ALJ considered the opinion of the state agency medical consultant, Dr. Alan Auerbach. In May 2008, Dr. Auerbach noted that the Plaintiff had the capacity for "light exertion work." (Tr. at 16.) There was no treating physician opinion in the record that indicated a more restrictive residual functional capacity. (Id.) In finding that the Plaintiff had the residual functional capacity for a full range of "sedentary work," the ALJ considered the evidence in the record in the light most favorable to the Plaintiff. (Tr. at 16.) The court is satisfied that the ALJ made the determination based on substantial evidence in the record, supported by the Plaintiff's own testimony.

## IV.   Conclusion

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is granted. Plaintiff's cross-motion is denied.

IT IS SO ORDERED.

Dated: New York, New York
       December 5, 2011

                                                    Robert P. Patterson, Jr.
                                                    U.S.D.J.

**Copies of this Opinion were sent to:**

*Plaintiff,* pro se:
Ruby Elizabeth Laderson
141 North Claybrook Street
Apartment #3
Memphis, TN 38104
Phone: 9901) 600-5161

*Counsel for Defendant*:
Susan D. Baird
U.S. Attorney's Office, SDNY
86 Chambers Street, 3rd Floor
New York, NY 10007
Phone: (212) 637-2713
Fax: (212) 637-2750
Email: Susan.Baird@usdoj.gov